FILED
2013 Sep-26  AM 09:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DENARIO JONES,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:12-CV-1117-KOB** |
| | ) | |
| **MICHAEL ASTRUE,** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On August 20, 2007, the claimant, Denario Jones, protectively filed for a period of disability and disability insurance benefits under Title II and supplemental security income under Title XVI of the Social Security Act. (R. 13).  He alleged disability beginning on August 8, 2007 from many impairments arising from a gunshot wound to the head and neck, including back pain, fatigue, depression, memory loss, and nightmares.  (R. 42).  The Commissioner initially denied the claims and the claimant timely filed a written request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on January 27, 2010. (R. 36).  In an opinion dated February 12, 2010, the ALJ found that the claimant was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act, and, therefore, was ineligible for a period of disability and disability insurance benefits, as well as supplemental income. (R. 24). The Appeals Council subsequently denied the

1

claimant's request for review on February 15, 2012, and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). As the claimant has exhausted his administrative remedies, this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The court has before it the following issues for review: (1) whether substantial evidence supports the ALJ's residual functional capacity (RFC) determination that the claimant could perform a limited range of light work; and (2) whether the ALJ's consideration of the claimant's failure to take prescribed pain medications on a consistent basis constitutes a reversible error in light of the claimant's testimony regarding his financial hardship.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports his conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. But this court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

This court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must look not only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take into account evidence that detracts from the evidence on which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1)     Is the claimant presently unemployed?
(2)     Is the claimant's impairment severe?
(3)     Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4)     Is the claimant unable to perform his or her former occupation?
(5)     Is the claimant unable to perform any other work within the national economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The ALJ reviews medical and other evidence to determine the claimant's RFC to do work despite his impairment. 20 C.F.R. §§ 404.1520(e) and 416.920(e); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Once the ALJ finds that a claimant cannot return to prior work, the burden of proof shifts to the Commissioner to show other work the claimant can perform. *Gibson v. Heckler*, 762 F.2d 1516 (11th Cir. 1985). The Commissioner must establish that the claimant,

who could not perform past relevant work, could perform other work in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). "The preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert." *MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir. 1986). "The burden of showing by substantial evidence that a person who can no longer perform his former job can engage in other substantial gainful activity is in almost all cases satisfied only through the use of vocational expert testimony." *Chester v. Bowen,* 792 F.2d 129, 132 (11th Cir. 1986).

Refusal by a claimant to follow prescribed medical treatment without good cause will preclude a finding of disability. 20. C.F.R. § 404.1530(b). However, poverty may excuse failure to follow prescribed medical treatment. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003). If the ALJ relies solely on a claimant's noncompliance as grounds to deny disability benefits, and the record indicates that the claimant could not afford prescribed medical treatment, the ALJ must make a determination regarding the claimant's ability to afford treatment; if the ALJ does not substantially or solely base his finding of nondisability on the claimant's noncompliance, he does not commit a reversible error by failing to consider the claimant's financial situation. *Id.*

## V. FACTS

The claimant completed the ninth grade and was thirty-two years old at the time of the administrative hearing. (R. 41). The claimant has past work experience as a food worker, food helper and dishwasher. (R. 48). The claimant alleged disability beginning on August 8, 2007 from many impairments arising from a gunshot wound to the head and neck, including back pain, fatigue, depression, memory loss, and nightmares. (R. 42, 11-120).

*Physical Limitations*

On August 7, 2007, the claimant visited UAB Emergency Room for a gunshot wound to the head and neck.  Dr. Hadley, a neurosurgeon, indicated no apparent neurological injury or vascular injury, but noted a bullet lodged in the C2 level of the neck.  Dr. Hadley also indicated that the gunshot wound to the head was in the left scalp through the skull and parieto-occipital confluence.  Dr. Hadley noted that the wound appeared to be above the transverse sinus, but stated that the borderline itself rested on the tentorium approximately four centimeters deep.  The claimant had "a fair bit of hemotoma" and an open contaminated wound that needed debridement.  (R. 213).

After the initial primary and secondary survey in the trauma bay, the claimant had a CT scan and radiographs taken.  The CT scan showed that the claimant's mental status was worsening.  (R. 210).  Dr. Hadley supervised a craniotomy with debridement that removed a "substantial" amount of blood clot, bone, and bullet fragment from the scalp entrance side, from the calvarial entrance site, and from the parenchyma, but he elected not to remove the bone fragment that was four centimeters deep.  (R. 213).

On August 9, 2007, Dr. Sherry Melton, a UAB physician, gave the claimant a tracheotomy and percutaneous endoscopic gastrotomy tube because he had posterior pharngeal involvement and extreme swelling and needed a definitive airway and an enteral feeding access.  Dr. Melton noted that the claimant "amazingly survived and was doing well from a gunshot wound to the back of the head."  (R. 211).

On August 12, 2007, another CT scan of the neck showed improvement in the perivertebral retropharyngeal soft tissue swelling.  The CT scan revealed no new hemorrhage, but showed pharyngeal and esophageal dysphagia.  On August 15, Dr. Thomas Randolph ordered a modified

5

baruim swallow exam.  The examiner administered the exam and found that oral transit problems were most pronounced with thicker substances.  The exam also revealed difficulties with both oral and pharyngeal swallowing. (R. 215).

On August 17, 2007, the hospital discharged the claimant. (R. 210).  Dr. Melton stated that, prior to his discharge, the claimant was walking, talking, and breathing normally.  She stated that he had also been decannulated.  (R. 232).  The hospital instructed the claimant to continue a clear liquid-only diet and gave him a home feeding tube.  He also received a prescription for liquid Lortab. (R. 210).

On August 22, 2007, the claimant had a  follow-up visit to the trauma clinic.  A physical examination show that the claimant had normal vitals and no respiratory distress.  Dr. Melton noted that the claimant could only take liquids, but "he is overall doing well."  She also noted that he had some "expected" headaches.  (R. 232).

On August 23, 2007, the claimant saw a speech pathologist for a repeat modified barium swallow exam.  Nancy McColloch, the examiner, stated that the claimant had significantly improved. She stated that the claimant could start a regular, dental soft diet, but had to avoid foods such as cookies, meat, and bread until his swallow strengthened and the trach site was occluded.  She said she strongly encouraged the claimant to begin tolerating his own secretions to strengthen and habituate the swallow.  (R. 230).  On September 5, 2007, the claimant reported tolerating small amounts of food.  He told the examiner that he had weight loss since the injury, but he felt like it had stabilized.  (R. 251).

On September 12, 2007, the claimant saw Dr. Hadley for a follow-up visit at the Neurosurgery Clinic.  Dr. Hadley found that the claimant's surgical incision site was "well healed."

He also found that the claimant appeared neurologically normal and that he had normal gait and station.  Dr. Hadley found no limitation in motion at the craniocervical junction or the proximal cervical spine with flexion, extension, lateral, bending, and rotation.  He noted that the claimant could walk on his toes, heals, and could tandem walk well.  He also noted that the claimant appeared intact from a cranial nerve perspective and mental status perspective. Dr. Hadley found that the claimant had good motor, sensory, and reflex results in the upper and lower extremities.  Dr. Hadley stated that, although the claimant had a bullet fragment lodged in the base of C2, the fragment had not created a C2 fracture and that the claimant had no instability.  He also stated that the claimant had no spinal cord injury and that the claimant had a "remarkable constellation of injuries and is remarkably relatively unscathed as a result of it." (R. 250).

On April 22, 2008, the claimant visited the Medical West Emergency Department complaining of a headache, wheezing, and abscesses.  The emergency room nurse found that the claimant's lungs had normal breath sounds and that he was neurologically intact.  The physician lanced the abscesses and proscribed the claimant an antibiotic and Lortab for pain.  (R. 364-70).

On July 25, 2008, the claimant visited the emergency room at UAB complaining of headaches, dizziness, blurry vision, and fatigue.  The claimant's Spurlings test was negative.  Dr. Billy Buckner, the emergency room physician, found that the claimant had occipital tenderness but no rubor, calor, swelling, or obvious foreign body.  Dr. Buckner indicated that the claimant was neurologically intact, and he found skin abscesses on the claimant's thigh and buttock.  A CT scan showed no change in appearance compared to his September 12, 2007 image and revealed that the claimant's bullet fragments did not change.  Dr. Buckner diagnosed the claimant with non-specific headaches, status post gunshot wounds, and skin abscesses.  (R. 347-48).

On February 15, 2009, the claimant visited the emergency room at UAB complaining of a seizure, abscesses, vision blurriness, and a severe headache.  Dr. Buckner noted that the claimant had a history of childhood seizures, but that he had not had seizures since childhood.  Dr. Buckner also noted that the claimant was on antiepileptic medicines after his 2007 gunshot injury, but he had not been on it long-term.  The claimant tested positive for nicotine abuse, cocaine abuse, and ethanol abuse.  Dr. Buckner noted that the claimant appeared alert and oriented, in no acute distress, but appeared anxious on exam. (R. 304).

Dr. Buckner noted that the claimant had an abscess on his right buttock and in his right axilla.  Regarding his seizures, the neurology team did not recommend starting any antiepileptic medications.  Dr. Buckner encouraged the claimant to refrain from driving, drinking, smoking, and taking illegal drugs.  He also gave the claimant a dose of Ativan for anxiety, hypertension and sachycardia that Dr. Buckner noted was likely sympathomimetic from his cocaine abuse.  The claimant admitted to using cocaine two weeks prior to his emergency room visit, but denied using any since that time.  The hospital discharged the claimant the same day.  (R. 304).

On June 22, 2009, the claimant visited the emergency room at Medical West with complaints of upper back pain.  The examining physician found that the claimant was neurologically intact with normal reflexes and painless range of motion.  The physician also found that the claimant had a normal inspection of the back and neck.  The claimant received a prescription for Ultram and Flexeril.  (R. 372-76).

*Mental Limitations*

On January 3, 2008, the claimant visited John Neville, a psychologist, on referral by the Division of Disability Determination.  At the psychological evaluation, Dr. Neville observed no

sensory or motor impairments.  Dr. Neville found that the claimant's speech was clear and

coherent and that he did not have apparent speech abnormalities.  He further found that the

claimant's mood was dysphoric and that he appeared mildly depressed, but that he was not

tearful, anxious, or apparently angry.  He noted that the claimant was not restless; he did not have

any tremors; and his mood was not labile.  Dr. Neville further noted that the claimant was alert

and well oriented, but that he did not remember any one of three items after a five-minute delay.

(R. 274-75).

During the evaluation, the claimant was able to discuss his previous day's activities; he

knew his son's birthday; he knew the current President; but he did not know the Governor.  He

was able to identify the national and state capitols.  Dr. Neville observed that the claimant had no

pressured speech, mumbling, slurring, or stuttering.  He further observed that the claimant had no

hallucinations or delusions.  Dr. Neville concluded that the claimant's judgment and insight were

adequate, but he estimated that the claimant's intellectual functioning was in the borderline to

mildly retarded range.  Dr. Neville noted that some declining in functioning possibly occurred

because of the claimant's injuries.  (R. 275).

Dr. Neville concluded that the claimant was cognitively able to manage financial benefits,

and cognitively and emotionally capable of functioning independently.  He stated that the

claimant could understand and carry out instructions, but his short-term memory was moderately

impaired.  He also stated that the claimant's ability to respond appropriately to co-workers was

mildly impaired and his ability to cope with ordinary work pressures was moderately to severely

impaired.  He observed that the claimant seemed willing to accept supervision. (R. 276).

Dr. Neville recommended psychotherapy and psychiatric treatment for the claimant.  He

9

stated that if the claimant received treatment, his prognosis over six to twelve months would be fair to good.  He also noted that he considered the claimant to be a reliable informant and historian.  (R. 276).

On January 11, 2008, Guendalina Ravello, Ph. D., a medical consultant, assessed the claimant's residual functional capacity.    Dr. Ravello found no limitations on the claimant's social interaction.  She stated that the claimant could "understand and remember simple instructions but not detailed ones because of symptoms of anxiety and cognitive deficits." Dr. Ravello concluded that the claimant could only carry out simple tasks; that he should be able to concentrate on those tasks for two hours; and that he would need all customary rests and breaks. She found that the claimant "could tolerate ordinary work pressures but should avoid: excessive workloads, quick decision making, rapid changes and multiple demands."  Dr. Ravello further found that the claimant could manage day-to-day goals, but needed help with long-term goals. Lastly, she noted that changes in the claimant's work setting should be presented gradually and infrequently to give time for adjustment.  (R. 293).

*The ALJ Hearing*

On January 11, 2008, the Commissioner determined that the claimant was not disabled and denied the claimant's application for disability insurance benefits and supplemental security income. (R. 61). The claimant timely filed a written request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on January 27, 2010.

At the hearing, the claimant alleged that he had many disabling impairments arising from a gunshot injury including severe pain, fatigue, memory loss, nightmares, and depression. The claimant testified that his fatigue prevented him from moving and standing for long periods of

time without getting tired or nauseous.  He stated that walking into the hearing to testify made

him tired, "so a few steps tire [him] out."  Regarding his pain, the claimant testified that the pain

travels from his spine to his head in the form of migraines or back spasms.  He also stated that

the spasms occur constantly and spontaneously.  (R. 42-44).

Next, the claimant alleged that he continues to have a recurring nightmare and that he

occasionally hallucinates.  He admitted that he never had any mental health treatment for his

alleged mental impairments, but he stated that he sought treatment by asking his family to take

him to a mental health facility.  He also stated that he told the emergency room doctors about his

mental impairments, but they "never looked into it."  (R. 44).

The claimant admitted that he tested positive for cocaine during his visit to the emergency

room for a seizure. He stated that the positive test result was because he touched a plate at a

friend's house that had cocaine residue on it.  He admitted that he also tested positive for alcohol,

but stated that he drank about six to twelve beers the day before and the day of his emergency

room visit because he was grieving over a dead friend.  He said he had no problems with alcohol

after his emergency room visit.  (R. 44-45).

Next, the claimant testified that he "kept a job" and that he "loved to work," but the bullet

fragments lodged in his spine make it uncomfortable and painful to work.  He stated that he

could not work even a light, easy job because his tail bone starts to hurt.  He mentioned that he

worked in the past as a cook in restaurants and performed odd jobs like painting, washing cars,

and installing systems in cars.  He testified that he is currently financially dependant on his

family.  (R. 46-47).

Finally, the claimant testified that he tries to mitigate his severe pain with over-the-

11

counter medication because he cannot afford prescribed medicine.  The ALJ responded that she would take the claimant's inability to afford medication into account.  She also recommended vocational rehab and stated that vocational rehab might be able to help finance his medication. (R. 52-53).

Next, the vocational expert, Dr. William Crunk, described the claimant as a "younger individual that has a limited education."  Dr. Crunk stated that the claimant had past relevant work in the food industry as a food worker, food helper, and dishwasher.  (R. 48).

The ALJ described a hypothetical individual with the following limitations:  a history of a gunshot wound to the head and spine; a PEG tube; speech impairments requiring treatment; ability to sit, stand, and walk, in any combination, for at least eight hours; ability to lift and carry five to ten pounds or ten to twenty pounds; instances of drug and alcohol abuse that were not contributing factors; provisional borderline intellectual functioning; post-traumatic stress disorder; cognitive ability to manage financial benefits; capability of functioning independently; ability to understand instructions; moderate impairment of short-term memory; moderate impairment in carrying out instructions; ability to follow simple instructions; mild impairment in his ability to respond to co-workers appropriately; and ability to cope with simple, ordinary work pressures as opposed to jobs with production quota pressures.  The ALJ asked Dr. Crunk if jobs existed that hypothetical individual could perform despite the listed impairments.  (R. 50).

In response, Dr. Crunk testified that the claimant could not perform any past relevant work in a fast food restaurant or kitchen because of the level of involvement with co-workers and the high pace environment.  However, Dr. Crunk found that the claimant could perform other work that existed in significant numbers in the national economy.  Dr. Crunk stated that the

12

claimant could perform light level jobs such as laundry sorter and housekeeper.  He further stated that the claimant could perform sedentary level jobs such as bench work/table production where a person performs non-production assembly and packaging by hand.  (R. 50-51).

*The ALJ Decision*

The ALJ rendered her decision on February 10, 2010, finding that the claimant was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. (R. 24).  The ALJ  began her opinion with a detailed description of the five-step sequential evaluation process used to determine if a person is disabled under the Social Security Act.   First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through June 30, 2011.  The  ALJ also determined that the claimant had not engaged in substantial gainful activity since August 8, 2007.  (R. 14-15).

Next, the ALJ found that the claimant had the severe impairments of status post gunshot wound to the head and right neck, post-traumatic stress disorder (provisional), headaches, and a history of one seizure.  The ALJ determined that the claimant's physical impairments did not meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 because no treating physician or medical expert found that the claimants impairments met or equaled any listing, and the objective evidence did not suggest that the impairments met or equaled a listing.  (R. 16).

The ALJ also determined that the claimant's mental impairment did not meet or medically equal the criteria of listings 12.02 and 12.06.  In making this finding, the ALJ considered the criteria for "paragraph B" and found that the claimant's mental impairment did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration.  The ALJ also considered the criteria for "paragraph C" and found no evidence

13

of a chronic affective disorder of at least two years duration that caused more than a minimal limitation of ability to do basic work activities.  In her "paragraph C" consideration, she further found no evidence of repeated episodes of decompensation or a current history of one or more years of inability to function outside a highly supportive living arrangement.  (R. 17).

Next, the ALJ determined that the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b).  She stated that the claimant can follow 1-2 step simple instructions; has mild deficits in his ability to respond appropriately to co-workers and accept supervision; and has moderate deficits in his ability to respond to work pressures. In making her finding, the ALJ considered objective medical evidence and the claimant's subjective complaints of pain.  The ALJ concluded that the claimant's allegation that upper and lower back pain and headaches prohibit him from working is credible only to the extent that his impairment produces mild to moderate limitations.  She found that the claimant's impairments do not prevent him from performing a significant range of light work. (R. 17).

In making her residual capacity determination, the ALJ applied the pain standard and found that the claimant's allegations of pain were not fully credible when considered in light of his own description of his activities.  First, she noted that in January 2008, the claimant described maintaining his hygiene independently except for needing someone to wash his back.  Second, the ALJ noted that the claimant reported that he socializes with his family and watches television most of the day.  She considered that the claimant described doing no household chores or cooking as his mother and girlfriend perform those tasks, but found that no treating or examining physician reported any deficits in his activities of daily living.  (R. 18).

The ALJ noted that the claimant did not take prescribed pain medications on a consistent

14

basis despite his allegations of constant pain and that his behavior is not of an individual with debilitating symptoms because the claimant has sought very little treatment for his alleged symptoms. She further noted that the claimant was never treated by a mental health professional despite his allegations of depression; he takes no psychotropic medications; and the claimant's treating trauma physician and neurosurgeon had no reports of depression and anxiety. (R. 18-19).

Next, the ALJ considered the claimant's gunshot wounds to the head and neck. The ALJ concluded that the medical evidence shows some residuals from his gunshot wounds, but not at a disabling level. She acknowledged that the claimant was hospitalized for ten days and retained bullet fragments, but she found that Dr. Hadley noted no evidence of neurological deficits at the claimant's follow-up appointments. The ALJ also noted that the treating neurosurgeon found the claimant's recovery to be "quite remarkable." Therefore, she concluded that the claimant could perform a modified range of light work despite his gunshot injuries. (R. 19-20).

Next, the ALJ considered the claimant's headaches, seizure activity, and upper back pain. She concluded that the majority of evidence did not support disabling symptoms related to these impairments. She found that the claimant's seeking very little treatment is contrary to his allegations and testimony. (R. 20-21).

The ALJ then considered the claimant's post-traumatic stress disorder when making her residual functional capacity determination. She concluded that the record contains no evidence of disabling symptoms because the claimant had never sought mental health treatment; he had no admissions or emergency room visits resulting from mental impairments; he had no complaints of anxiety, depression, nightmares or memory loss at his post-admission treatments; and his treating trauma physician and neurosurgeon noted no mental impairments. Therefore, the ALJ concluded

15

that the claimant's impairments could cause the alleged symptoms, but the claimant's statements regarding the limiting effects of the symptoms were inconsistent with the medical record and the residual capacity assessment.  (R. 21-22).

Lastly, the ALJ found that the claimant could not perform any past relevant work, but could perform other work that exists in significant numbers in the national economy.  Based on the vocational expert testimony, the ALJ found that the claimant could perform unskilled light jobs such as laundry sorter and housekeeper, and sedentary jobs such as bench work/table production.  Thus, the ALJ concluded that the claimant could make a successful adjustment to other work.  Therefore, the ALJ made a determination that the claimant was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. (R. 23-24).

*The Appeals Council Decision*

Although the record reflects that the ALJ issued her decision on February 12, 2010, claimant and his attorney claim that they did not receive notice of the decision until March 2, 2011, after following up with ODAR. (R. 8). On receipt of the decision, claimant appealed to the Appeals Council on April 4, 2011. Along with his appeal, claimant also submitted additional evidence. (R. 7). The Appeals Council denied claimant's request for review, but admitted and considered the additional evidence submitted by claimant. (R. 1-5).

*Additional Evidence Considered by the Appeals Council*

The additional evidence considered by the Appeals Council consisted of a May 19, 2010 psychiatric assessment and a brief to the Appeals Council by claimant's attorney. The first piece of additional evidence, claimant's brief, summarized the case and made essentially the same RFC argument that is before this court here.

The second piece of additional evidence showed that on May 19, 2010, the claimant visited Dr. Wolfram Glaser for a psychiatric assessment at Western Mental Health Center.  The claimant referred himself for an assessment, stating, "I kinda just need...my mental state and my physical state...anxiety, pain, nightmares, flashbacks."  The claimant reported that he had fatigue, short attention span, pain, severe anxiety, and trauma from his gunshot injury.  He stated that he worries the movement of the retained bullets may kill him.  He also stated that he sleeps poorly because of insomnia, flashbacks, nightmares, and pain.  The claimant mentioned that he had some passive suicidal thoughts.  Dr. Glaser found that the claimant was in "considerable distress" and that he was "somewhat depressed, not psychotic, and neither agitated nor slowed.  He is a little unsteady at times."  Dr. Glaser diagnosed the claimant with chronic PTSD, head trauma from a gunshot wound, history of epilepsy, and severe anxiety. He referred claimant to the hospital's Assisted Outpatient Treatment department for management of his medicines and counseling, but upon discharge, stated that the claimant no longer required psychiatric treatment.  (R. 378-79).

## VI. DISCUSSION

The court first notes that in considering claimant's arguments and the evidence supporting the ALJ's opinion, the court considers the *entire* record, including the additional exhibits added to the record by the Appeals Council after the ALJ made her decision. The Eleventh Circuit requires such consideration, stating that "a federal district court must consider evidence not submitted to the administrative law judge but considered by the Appeals Council when the court reviews the Commissioner's final decision denying Social Security benefits." *Ingram v. Commissioner of Social Sec. Admin.*, 496 F.3d 1253, 1258 (11th Cir. 2007).

17

*1. The ALJ's RFC findings are based on substantial evidence.*

The claimant argues that the ALJ's RFC findings were not based on substantial evidence. To the contrary, the court finds that the ALJ's RFC findings were based on substantial evidence.

The ALJ reviews medical and other evidence to determine the claimant's RFC to do work despite his impairment. 20 C.F.R. §§ 404.1520(e) and 416.920(e); see also *Lewis*, 125 F.3d at 1440. The claimant bears the initial burden of proving he is disabled. *Gibson*, 762 F.2d at 1516. If the ALJ finds that the claimant cannot perform any past relevant work, then the ALJ bears the burden of proving the claimant can perform other work that exists in significant numbers in the national economy. *Chater*, 67 F.3d at 1559 (11th Cir. 1995). Vocational expert testimony can provide substantial evidence to prove the claimant can perform other work despite his impairments. *Chester,* 792 F.2d at 132.

In the present case, the ALJ explicitly discussed the medical records concerning each of the claimant's impairments to determine the claimant's residual functional capacity. The ALJ considered the consistency between all of the claimant's symptoms and the objective medical evidence. She found that the claimant's alleged inability to perform any significant work activities on a sustained basis was inconsistent with his treating physicians' records and the claimant's own description of his daily activities. Dr. Hadley, Dr. Melton, and Dr. Buckner each noted during their interactions with the claimant that he was neurologically intact and that he had remarkably recovered from a gunshot wound to the head and neck. Furthermore, the claimant stated that he could maintain his hygiene independently besides needing someone to wash his back. The ALJ determined that the claimant can perform light work, can follow 1-2 step simple instructions, has mild deficits in his ability to respond appropriately to co-workers and accepting

18

supervision, and has moderate deficits in his ability to respond to work pressures.

Because the ALJ based her residual functional capacity determination on objective medical evidence and other evidence, she applied the proper legal standard to her residual functional capacity determination. Furthermore, the additional evidence considered by this court, the psychiatric assessment of Dr. Glaser, does not change this assessment because it does not contradict any of the other evidence regarding claimant's ability to perform daily activities and even states that claimant no longer requires psychiatric treatment.

Because the ALJ determined that the claimant could not perform his past work, she carried the burden of proving that the claimant could perform other work that exists in significant numbers in the national economy.  The ALJ questioned Dr. Crunk, the vocational expert, about whether the claimant could perform any other work despite his impairments.  Dr. Crunk testified that the claimant could perform light level jobs such as laundry sorter and housekeeping; and he could perform sedentary jobs such as bench/work table production.  Dr. Crunk further testified that the listed jobs exist in significant numbers in the national economy.  Because vocational expert testimony constitutes substantial evidence that a claimant can perform other work despite his impairments, the ALJ had substantial evidence to make her residual functional capacity determination.

Based on the explicit findings of the ALJ based on the claimant's medical records, the vocational expert's corroborative testimony, and this court's assessment of the additional evidence, this court concludes that the ALJ had substantial evidence to support her RFC findings.

*2. The claimant's financial hardship does not constitute a reversible error.*

Although the claimant did not raise his inability to afford medication as an issue before

19

this court, the court will evaluate whether the ALJ committed a reversible error in considering the claimant's failure to take prescription pain medication in light of his financial hardship. This court finds that because the claimant's failure to take prescription pain medication was neither a substantial factor, nor the sole factor, in the ALJ's decision to deny the claimant disability benefits, the ALJ did not commit a reversible error.

Refusal by a claimant to follow prescribed medical treatment without good cause can preclude a finding of disability. 20. C.F.R.§ 404.1530(b). However, poverty may excuse failure to follow prescribed medical treatment. *Ellison*, 355 F.3d at 1275. If the ALJ relies *solely* on a claimant's noncompliance as grounds to deny disability benefits, and the record indicates that the claimant could not afford prescribed medical treatment, the ALJ must make a determination regarding the claimant's ability to afford treatment. *Id.* If the ALJ does not substantially or solely base his finding of nondisability on the claimant's noncompliance, though, the ALJ does not commit a reversible error by failing to consider the claimant's financial situation. *Id.*

In the present case, the record indicates that the claimant did not take prescription pain medication on a consistent basis despite his alleged severe pain. At the hearing, the claimant testified that he could not afford to buy prescription pain medication, so he treated his pain with over-the-counter medication. The claimant further testified that he was completely financially dependent on his family. In her opinion, the ALJ found that the claimant's failure to take prescribed medications on a consistent basis was not the behavior of an individual with debilitating symptoms. The ALJ noted the claimant's failure to request prescriptions to help curb his pain, but she did not note any failures with buying or taking his existing prescribed medications. Therefore, the court finds that the ALJ had no requirement to consider the

claimant's financial condition in making her determination of disability.

Furthermore, the ALJ did not substantially base her decision on the claimant's failure to take prescribed pain medication.  The ALJ focused her decision on inconsistencies between the claimant's subjective testimony and the medical record.  The ALJ noted that the claimant's treating physicians stated that the claimant recovered "remarkably"; he had normal exams of the back and neck; and he was neurologically intact with normal reflexes and painless range of motion. As noted by the ALJ, all of these findings are inconsistent with the claimant's testimony that he could not perform even light work without experiencing severe pain.  Also, the ALJ determined that the claimant's subjective testimony was inconsistent with his own activities of daily living.  The claimant stated that he could maintain his hygiene independently, except for needing someone to wash his back.  The ALJ determined that the claimant's activities of daily living discredited his subjective testimony of pain.  While the ALJ did note that the claimant's failure to take prescription pain medication was not the behavior of a person with debilitating symptoms, the basis of her decision was the claimant's daily activities and the treating physicians' records.  Therefore, the ALJ did not commit a reversible error in failing to consider the claimant's financial hardship.

## VII. CONCLUSION

For the reasons stated, this court finds that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED. The court simultaneously will enter a separate Order to that effect.

DONE and ORDERED this 26th day of September, 2013.

KARON OWEN BOWDRE
UNITED   STATES   DISTRICT   JUDGE

21